### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**

   v.        **1:05-CR-10081-MLW-ALL**

**ALEX S. NEWMAN**

### GOVERNMENT'S TRIAL BRIEF

#### I. INTRODUCTION

The Indictment in this case alleges that the defendant Alex S. Newman ("Newman") committed nine separate acts of wire fraud, in violation of 18 U.S.C. §1343, while stealing $280,000 from his employer, Boston Fitness.[1]  According to the Indictment, the defendant stole the money by secretly transferring $125,000 from Boston Fitness' bank accounts to his personal bank accounts, and using money deposited to Boston Fitness' accounts to post credits, totaling $155,000, to his personal credit card accounts.[2]

Counts Ten and Eleven allege that Newman willfully failed to pay federal income tax on the money he stole in 1999 and in 2000, in violation of 26 U.S.C. §7201.[3]

---

[1]  All references to dates and dollar amounts are approximations.

[2]  Three of the wire fraud accounts relate to separate financial transactions (involving the use of interstate wire communications) by which money was transferred to different bank accounts.  The other six wire fraud counts relate to separate financial transactions (involving interstate wire communications) by which credits were posted to six different credit card accounts.

[3]  Newman also willfully failed to pay taxes on additional amounts of money he stole from Boston Fitness in 1998 ($6,902.00) and 2001 ($13,858.00).  These offenses are not charged because

## II. ELEMENTS OF THE OFFENSES

### Wire Fraud

To successfully prosecute Newman for wire fraud, the government must prove:

>    **First**, that he engaged in a scheme, substantially as charged in the indictment, to defraud or to obtain money from Boston Fitness, by means of false or fraudulent pretenses, representations or promises;

>    **Second**, that he acted knowingly and willfully; and

>    **Third**, that the scheme involved the use of interstate wire communications.

See Pattern First Circuit Jury Instruction (Criminal), No. 4.13 (1998); and United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993) (describing elements of wire fraud).

### Tax Evasion

To successfully prosecute Newman for tax evasion we must prove:

>    **First**, that he owed substantially more federal income tax in 1999 and 2000 than he reported on his income tax returns for those years;

>    **Second**, that he intended to evade or defeat the assessment or payment of the tax; and

>    **Third**, that he willfully committed an affirmative act in furtherance of this intent.

See United States v. Hogan, 861 F.2d 312, 316 (1st Cir. 1988).

---

the resulting loss to the Internal Revenue Service is minimal.

III.  **FACTS**

A. **Newman's Background**

Until it was purchased by Bally Fitness in April 2003, Boston Fitness Management Company ("the management company"), operated 7 health clubs ("the clubs") in Massachusetts and Maine.  The management company and the clubs were owned by David Laird and Scott Baker.[4]

A 1997 graduate of Boston College Law School, Newman was employed as Boston Fitness' systems manager from approximately July 1998 to January 2001.  As such, he spent most of his time performing routine maintenance on and repairing computers that were used in the clubs and the management company's office in Wakefield, Massachusetts.

From his office in Wakefield, Newman also participated in the process through which monthly membership dues were billed to members of the clubs.  He also played a role in tracking the collection of membership dues.  Although there is some confusion about this issue, Newman may have also had some authority to refund mistakenly collected membership dues to former members of the clubs.

Because Laird and Baker were so pleased with the way Newman performed his responsibilities and interacted with Boston Fitness'

---

[4]     Laird and Baker established separate legal entities for each club and the management company.

other employees, they arranged for the management company to pay for Newman to take a Bar review course and the Massachusetts Bar examination.  Laird and Baker gave Newman an additional title, in-house-counsel, shortly after he passed the BAR examination in 1999.

## B. Collection of Membership Dues

Almost all of Boston Fitness' members paid their monthly membership dues by authorizing Boston Fitness to automatically withdraw funds from their personal bank accounts, or submit charges to their credit card accounts each month.  The dues were deposited to separate bank accounts that were established for each club at U.S. Trust Co. and (later) Citizens Bank.[5]

The billing information that was provided by each member -- which included the member's bank or credit card account number, and the routing number for the member's bank -- was a required part of each membership application.  This information was given to Newman, who used a computer provided to him by Boston Fitness and a software program, "Pronto," to forward the information to Citizens Bank's computer system.[6]  Thereafter, the bank automatically initiated the interstate wire communications that were necessary to transfer funds from a member's bank account, or to submit charges

---

[5]    U.S. Trust Company was purchased by Citizens Bank in February 2002. To simplify matters, I refer to both banks as "Citizens Bank" or "the bank."

[6]    The Pronto software billing program was created by a company known as Computer Outfitters, Incorporated.

to a member's credit card account.

To make the collection of dues more efficient, the bank used a feature of "Pronto" that automatically continued the collection of dues from each customer (i.e., without prompting from an employee of the bank or Boston Fitness), until the direction to collect dues from a customer was modified or deleted from the system.

When dues were mistakenly collected from a former member's bank account or credit card, Boston Fitness issued a check to the former member, or posted a credit to the member's credit card account.

Significantly, the information Newman submitted to the bank for these purposes were not monitored or reviewed by anyone at Boston Fitness or Citizens bank.   In addition, none of the financial transactions through which membership dues were collected or refunded were specifically recorded on the monthly bank account statements the bank provided to Boston Fitness' management company. Instead, the amount of money that was collected by the bank for each club during a particular month was recorded as a single deposit on each club's monthly bank account statement.[7]

---

[7]     For example, if the bank collected $20 monthly membership dues from 100 members and refunded one $20 monthly payment to a former member, the transactions would be recorded as a single $980.00 deposit on the club's bank account statement.

C. **Uncharged Conduct**

On November 12, 2001, Newman used a credit card that was issued to Boston Fitness by a computer store, CompUSA, to purchase a digital camera, a printer for the camera, a DVD player and a *Mission Impossible* DVD for $1,464.83.[8]  The camera and the printer were purchased at the request of David Laird's wife, Deborah, who planned to give the items to her husband for Christmas.

Shortly after the items were purchased, Laird approved Newman's request to be reimbursed $1,464.83 by Boston Fitness because he believed that Newman had incurred the expense for Boston Fitness.[9]  Newman also enriched himself by accepting a personal check for $885.00 from Deborah Laird when he delivered the camera and printer to her on November 20, 2001.

While reconciling Boston Fitness' CompUSA account in December 2000, Laird made several requests for Newman to provide a receipt for the November 12 purchase.  When the receipt was finally delivered to him, Laird noticed that the items listed on it were not in the possession of Boston Fitness and some of the items were of no use to the company.  He  immediately suspected that Newman

---

[8]     The transaction violated a well known company policy that prohibited employees from using the company's credit cards for personal business.

[9]     When Newman incurred legitimate expenses on behalf of the company, he was re-paid in cash or through electronic deposits to a personal account he maintained at Fleet Bank account.

had stolen money from Boston Fitness by obtaining reimbursement for personal items that were purchased with the company's credit card. When Laird learned that his wife paid Newman for the camera and the printer that were identified on the sales receipt, he promptly reported Newman's conduct to a local police department and fired him.[10]

### D. **The Wire Fraud Scheme**

While investigating Laird's allegation, the FBI obtained copies of monthly statements for three of Newman's bank accounts and six credit card accounts that he used while working for Boston Fitness. The bank account statements document 426 instances in which more than $125,080 was wire transferred from the clubs' bank accounts to Newman's bank accounts. The credit card statements document 559 separate credits, totaling $155,768, that were posted to Newman's credit card accounts, using money electronically withdrawn from the clubs' bank accounts.[11] Each of the embezzlement transactions was accomplished through the electronic exchange of

---

[10]    A subsequent investigation by the FBI revealed that Newman may have employed variations of the same scheme to steal $15,000 from Boston Fitness. The government has agreed not to present evidence of Newman's misuse of Boston Fitness' CompUSA credit card, unless Newman suggests, by way of argument or evidence, that the transactions underlying the wire fraud scheme were meant to reimburse him for legitimate expenses he incurred on behalf of Boston Fitness.

[11]    To simplify matters, the unauthorized deposits to Newman's bank accounts and the unauthorized credits to his credit card accounts are referred to hereinafter as "the unauthorized deposits."

information between numerous financial entities located in different states.  All of the proceeds from the transactions were used by Newman and/or (unwittingly) his former wife, Elizabeth, for their personal benefit.

Newman's bank and credit card statements cryptically indicate that each transaction originated from Boston Fitness.  Through a time-consuming review of the bank's computerized records, an employee of Citizens Bank, Thomas Mullen, identified the particular Boston Fitness account from which approximately 90% of the transactions originated.[12]

It was relatively easy for Newman, a person with demonstrated computer expertise, a familiarity with "Pronto," and access to Boston Fitness' bank accounts and Citizens Bank computer system to conduct the unauthorized deposits without being noticed.

According to David Peyton, a knowledgeable employee of Computer Outfitters, Newman probably conducted the unauthorized transactions by creating a separate file in his computer that only he had access to.  Working in that file and using the Pronto software billing program, Newman designated one of Boston Fitness' bank accounts as the "originating account," designated one of his personal accounts as the destination account," decided how much he

---

[12]    At the end of each business day, the bank stored information related to its daily financial transactions on a CD rom.  Mullen identified the particular Boston Fitness account from which the embezzlement transactions originated by reviewing CD roms for each day that an embezzlement transaction occurred.

wanted to withdraw from the Boston Fitness account, provided the relevant account and bank routing numbers and submitted the information to the bank. As explained, the transactions were not identified on the monthly account statements that were provided by Citizens Bank to Boston Fitness because the transactions were conducted through Pronto.

The government is also prepared to prove that no one could view this incriminating file because the computer Newman used was not automatically backed-up to a server, and no one else had access to the non-backed up information that was stored in his computer.

Newman's efforts to conceal the unauthorized deposits were also aided by the fact that the information he submitted to the bank to accomplish the unauthorized and legitimate transactions was not monitored or reviewed by anyone at Boston Fitness or the bank.

### E. **Tax Evasion Offenses**

Newman lived in Pelham, New Hampshire for most of 1999. According to his 1999 federal income tax return and an attached IRS Form W-2, Newman paid $4,752 in taxes on the $28,926 salary earned as an employee of Boston Fitness. The return did not disclose the additional $109,181 in income Newman derived from his embezzlement scheme in 1999, for which he owes the IRS an additional $33,618.

Newman filed his personal 2000 federal income tax return in 2001, while living in Naples, Florida. The return was submitted to the IRS office in Atlanta, Georgia. It calculated the amount of

tax Newman owed, $10,091, on the amount of income he was paid by
Boston Fitness in 2000, $48,220.  The return did not disclose the
additional income he derived from his embezzlement scheme in 2000,
$150,908, for which he owes the IRS an additional tax of $50,271.

### IV. **Possible Defenses**

#### A. **Intent**

Newman's only defense to the wire fraud **and** tax evasion
charges is that the wire transfers to his personal bank accounts
and the credits to his credit card accounts were legitimate
transactions, conducted with Laird's and/or Baker's approval, to
reimburse him for business related expenses that he incurred on
behalf of Boston Fitness.[13]

Testimony from Newman aside, there is no evidence to support
this defense.  It is also rebutted by, among other things, the
circuitous and clandestine manner in which the unauthorized
deposits occurred, and the fact that Newman did not have unfettered
authority to spend money on behalf of the company, he routinely
submitted receipts for legitimate business expenses to Laird, and
he did not submit receipts for any of the unauthorized deposits.

#### b. **Venue: Tax Evasion Charges**

The government is required to prove by a preponderance of the

---

[13]     If that defense is to have any meaning, Newman cannot
claim that the unauthorized deposits did not occur in the manner
and in the amounts that are alleged.

evidence that Massachusetts is a proper venue to prosecute Newman. United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004). Massachusetts is an appropriate venue to prosecute the tax evasion offense alleged in Count Ten of the Indictment because Newman's 1999 tax return was submitted to the IRS Service Center in Andover, Massachusetts. United States v. Felak, 831 F.2d 794, 799 (8th Cir. 1987); and United States v. Marchant, 774 F.2d 888, 891 (8th Cir.1985), cert. denied, 475 U.S. 1012 (1986) (tax evasion is a "continuing offense" that can be prosecuted in the district where the return was prepared, signed, mailed, or filed, or where the attempt to evade taxes "otherwise occurred.")

Prosecuting the tax evasion offense alleged in Count 11 is another matter because Newman's 2000 tax return was submitted to the IRS Service Center in Atlanta, Georgia, and the government cannot prove where the return was prepared, signed or mailed. Accordingly, to establish Massachusetts as a proper venue to prosecute that offense the government must prove that Newman committed an act in Massachusetts in an effort to evade paying taxes on the money he stole in 2000. See United States v. Strawberry, 892 F. Supp. 519, 520 (S.D.N.Y. 1995)("Courts have found venue for §7201 offenses to be proper in any district where an affirmative act constituting an 'attempt to evade' was begun, continued or completed").

When, as here, "venue [for a charge of tax evasion is]

premised on acts other than those connected with the preparation, signing, mailing or filing of the tax return at issue, courts have turned for guidance to the Supreme's Court's analysis in Spies v. United States, 317 U.S. 492, (1943)." Id.  In Spies, the Supreme Court stated:

> Congress did not define or limit the methods by which a willful attempt to defeat or evade might be accomplished and perhaps did not define lest its efforts to do so result in some unexpected limitation. By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or conceal.  If the tax evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime.

317 U.S. at 499.

As stated, Newman performed numerous acts in Massachusetts that were designed to conceal his larcenous conduct.  In the government's view, those acts can be used, consistent with Spies, as a basis to prosecute the tax evasion charge alleged in Count Eleven because each of those acts also served to conceal from the IRS Newman's receipt of stolen money in 2000.

Dated: January 11, 2006

                              Respectfully submitted,

                              MICHAEL SULLIVAN
                              United States Attorney

                   By: /s/ Robert M. Kinsella
                     Robert M. Kinsella
                     Special Assistant United States Attorney
                     53 Pleasant St. 3rd Floor
                     Concord, New Hampshire 03301
                     (603) 225-1552

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on January 11, 2006, I caused a copy of the foregoing to be filed electronically and be sent by electronic mail to:

                        Juliane Balliro, Esq.
               Wolf, Block, Schorr & Solis-Cohen
                     1 Boston Place
                Boston, Massachusetts 02108

               _____/s/ Robert M. Kinsella_____
                       Robert M. Kinsella
                 Special Assistant U.S. Attorney