# UNITED STATES DISTRICT COURT
### for the
## DISTRICT OF MASSACHUSETTS

**1:05-cr-10081-MLW-ALL**

## UNITED STATES OF AMERICA

## V.

## ALEX S. NEWMAN

## DEFENDANT'S NOTICE OF INTENT TO UTILIZE WITNESS'S PRIOR CRIMINAL RECORD FOR IMPEACHMENT AT TRIAL

Now comes the Defendant, through counsel, and respectfully submits this Notice of Intent to Utilize Witness's Prior Criminal Record for Impeachment at Trial ("Notice") pursuant to Fed. R. Evid. 609(b). As reasons therefore, the Defendant states the following:

1.     The United States has indicated it intends to introduce Alan B. Morovitz ("Morovitz") as a witness against the Defendant.

2.     The Defendant intends to introduce evidence to impeach Morovitz on cross-examination.

3.     The Defendant's proposed impeachment of Morovitz includes evidence regarding Morovitz's prior criminal record.

4.     The Defendant intends to introduce evidence that in 1988, Morovitz entered a plea of guilty to the offense of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. § 371, in United States of America v. Alan B. Morovitz, Case Number 88-00245-01-S, District of Massachusetts. See Judgment In a Criminal Case, attached as Exhibit A.

5.     In summary, Morovitz was charged with conspiring to devise and operate

a scheme "to defraud borrowers and potential borrowers in search of loans throughout the United States, and to obtain money in the form of 'advance fees' by means of false and fraudulent pretenses, representations, promises, and omissions of material fact … ." <u>See</u> Information, <u>U.S. v. Morovitz</u> attached as Exhibit B.

6.      Although the offense occurred more than 10 years ago, the Defendant believes the evidence relevant as to the reliability of Morovitz's anticipated testimony.

7.      Moreover, the Defendant believes the probative value of the evidence outweighs any potential prejudicial effect of its introduction because, *inter alia*, the conviction was for a crime of dishonesty.  <u>See</u> <u>United States v. Phillips, et al.</u>, 488 F. Supp. 508, 512 (W.D. Mo. 1980) (holding that a "conviction for fraud and conspiracy to commit fraud under 18 U.S.C. § § 1341 and 371 is one involving 'dishonesty or false statement' within the meaning of Rule 609(a)(2)").


WHEREFORE, the Defendant respectfully submits his Notice of Intent to Utilize Witness's Prior Criminal Record for Impeachment at Trial.

> Respectfully submitted,
> Alex Newman
> By his attorney,
>
>
> _____/s/ Juliane Balliro_____
> Juliane Balliro (BBO#028010)
> Wolf, Block, Schorr & Solis-Cohen
> One Boston Place
> Boston, MA 02108
> 617-226-4000

April 12, 2006

**<u>Certificate of Service</u>**

I hereby certify that, on April 12, 2006, I caused a copy of the foregoing to be filed electronically and via electronic mail to:

**AUSA Robert M. Kinsella**
53 Pleasant St., 4th Floor
Concord, New Hampshire 03301
robert.kinsella@usdoj.gov


\_\_\_\_\_/s/ Juliane Balliro_____
Juliane Balliro

# United States District Court

————————————————— DISTRICT OF MASSACHUSETTS —————————

UNITED STATES OF AMERICA

V.

**JUDGMENT IN A CRIMINAL CASE**

ALAN B. MOROVITZ

Case Number: 88-00245-01-S

250 Kennedy Drive
Malden, Mass. 02148

(Name and Address of Defendant)

————— Michael A. Collora, Esq. —————
Attorney for Defendant

## THE DEFENDANT ENTERED A PLEA OF:

[☒ guilty ☐ nolo contendere] as to count(s) _____ 1 _____, and
☐ not guilty as to count(s) _____.

## THERE WAS A:
[☐ finding ☐ verdict] of guilty as to count(s) _____.

## THERE WAS A:
[☐ finding ☐ verdict] of not guilty as to count(s) _____.
☐ judgment of acquittal as to count(s) _____.
    The defendant is acquitted and discharged as to this/these count(s).

THE DEFENDANT IS CONVICTED OF THE OFFENSE(S) OF: Conspiracy to Commit Mail Fraud
in violation of Title 18, United States Code, Section 371

IT IS THE JUDGMENT OF THIS COURT THAT: the defendant is sentenced to the custody
of the Attorney General for imprisonment for a period of two (2) years, 120
days of which to be served, balance suspended and the defendant placed on
probation for a period of three (3) years. As special conditions of probation
the defendant shall perform 15 hours per week of community service and make
restitution not to exceed $920,000 as directed by the Chief Probation Officer.
The defendant shall report to the institution designated by the Attorney
General on January 3, 1989 by 12:00 Noon.

In addition to any conditions of probation imposed above, IT IS ORDERED that the conditions of proba-
tion set out on the reverse of this judgment are imposed.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 88-245-S |
| | ) | |
| v. | ) | VIOLATION: Conspiracy |
| | ) | 18 U.S.C. § 371 |
| ALAN B. MOROVITZ | ) | |

INFORMATION

COUNT ONE:   (18 U.S.C. Section 371 -- Conspiracy)

The United States Attorney charges that:

1.    At all times material to this Information:

   a.   Alan B. Morovitz represented himself to be founder,
        President and Chief Executive Officer of Group IV
        Capital Investments, Inc. and Group IV Capital Funding
        Corporation.

   b.   The offices of Group IV Capital Investments, Inc. and
        Group IV Capital Funding Corp. were located at 16 New
        England Executive Park, Burlington, Massachusetts and at
        50 Milk Street, Boston, Massachusetts.

   c.   Giulio Negrini represented himself to be President and
        Chief Executive Officer of Cergnul International, Inc.,
        and to be an officer of other corporations and
        entities.

   d.   The Office of Cergnul International, Inc. was located at
        30 Rockefeller Plaza, New York City, New York;

2.   From in or about January, 1983 to in or about April 1985, at
     Burlington and Boston in the District of Massachusetts, and
     elsewhere,

                          ALAN B. MOROVITZ

     defendant herein, did knowingly, wilfully, and unlawfully
     conspire, confederate, combine and agree together with
     Giulio Negrini, named as a co-conspirator herein but not
     as a defendant, and with others known and unknown to the
     Grand Jury to commit the following acts and
     offenses against the laws of the United States, to wit:

     a.   To devise and operate a scheme and artifice to defraud
          borrowers and potential borrowers in search of loans
          throughout the United States, and to obtain money in the
          form of "advance fees" by means of false and fraudulent
          pretenses, representations, promises, and omissions of
          material fact, then well knowing that said pretenses,
          representations, promises, would be and were false
          when made to borrowers in search of loans, and for
          the purpose of executing such scheme and artifice to
          defraud and attempting to do so, knowingly placed and
          caused to be placed in authorized depositories for mail
          matter, to be sent to and received from borrowers in
          search of loans, and to be sent and received among
          co-conspirators, and delivered by the Postal Service,
          literature, correspondence, documents, agreements and
          checks, in violation of Title 18, United States Code,
          Section 1341.

                                2

b.  To devise and operate a scheme and artifice to defraud
    borrowers and potential borrowers throughout the
    United States and to obtain money in the form of
    "advance fees" by means of false and fraudulent
    pretenses, representations, promises, and omissions of
    material fact through, in part, the use of wire
    communications in interstate commerce, including
    interstate wire transfers of money, then well knowing
    that said pretenses, representations and promises were
    false and fraudulent when made, in violation of Title
    18, United States Code, Section 1343.

c.  For the purpose of executing a scheme and artifice to
    defraud borrowers and potential borrowers throughout the
    United States of money and property in excess of
    $5,000.00 by means of false and fraudulent pretenses,
    representations, promises, and omissions of material
    fact, in the execution of such scheme and artifice
    induced the borrowers and potential borrowers to travel
    in or be transported in interstate commerce in
    violation of Title 18, United States Code, Section
    2314.

d.  For the purpose of executing a scheme and artifice to
    defraud borrowers and potential borrowers throughout the
    United States, and having obtained money in the form of
    "advanced fees," by means of false and fraudulent
    pretenses, representations, promises, and omissions of
    material fact, in the execution of such artifice and

scheme received and caused to be received securities and money of value of $5,000 and more, which securities and money were moving as, constituted, and were part of interstate commerce, then well knowing the securities and money to have been stolen and unlawfully converted, in violation of Title 18, United States Code, Section 2315.

## MANNER AND MEANS

3. The manner and means by which the foregoing objectives of the Conspiracy to commit mail fraud, wire fraud, inducement of interstate travel in furtherance of a scheme to defraud, and receipt of stolen moneys were to be accomplished included, but were not limited to, the following:

## THE SCHEME TO DEFRAUD

a. It was part of the scheme and artifice to defraud that Alan B. Morovitz and Giulio Negrini caused advertisements to be placed in the Wall Street Journal and other newspapers claiming to have access to foreign and domestic funds which were available to potential borrowers;

b. It was further a part of the scheme and artifice to defraud that Alan B. Morovitz and co-conspirators claimed to have successfully closed loans in association with and between Cergnul International, Inc. and Group IV Capital Investments, Inc.;

c.  It was further a part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators
    solicited potential borrowers through brokers/finders
    who worked on a fee or commission basis.

d.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators
    steered potential borrowers to and among Group IV
    Capital Investments, Inc., Group IV Capital Funding
    Corp., and Cergnul International, Inc. in order to
    obtain purported "loan commitments."

e.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators
    charged potential borrowers advanced fees in order to
    obtain purported "loan commitments."

f.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators
    solicited advance fees by means of false and misleading
    representations of material facts to potential borrowers
    and omission of material facts.

g.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators acting
    in concert caused potential borrowers to sign various
    agreements, contracts or other documentation
    which contained language inconsistent with the oral
    representations made by Alan B. Movitiz and
    co-conspirators concerning their ability to perform.

5

h.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators after
    obtaining the advance fee provided potential borrowers
    with "loan commitments", which "loan commitments" Giulio
    Negrini and co-conspirators knew were of no value to
    the potential borrowers.

i.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators would
    intentially construct the "loan commitments" with an
    intent and in a manner so as to delay and avoid funding
    of loans to potential borrowers.

j.  It was further part of the scheme and artifice to
    defraud that after providing the "loan commitments"
    which were of no value to the potential borrowers,
    Alan B. Morovitz and co-conspirators would not furnish
    any loan proceeds for which the potential borrowers had
    originally applied, but would keep the various fees
    collected by means of false and fraudulent
    representations and promises, and omissions of material
    fact.

k.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators would
    modify the requirements which were conditions precedent
    to the funding of loans, and would inform potential
    borrowers that the "loan commitment" would expire if
    the conditions were not met by the potential borrowers.

l.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators would
    keep the advance fees which they had collected by means
    of false, fictitious, and fraudulent pretenses,
    representations and promises and omissions of material
    facts more fully set forth below while never providing
    any loans to the potential borrowers.

m.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators used
    and caused to be used postal service mail delivery to
    send and receive representations, documents, checks and
    other materials.

n.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators caused
    and induced potential borrowers to pay the required
    advance fees by bank wire transfer, federal express,
    certified or cashiers checks, and other methods.

o.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators caused
    and induced potential borrowers to travel in interstate
    commerce to meet with the co-conspirators to discuss the
    potential borrowers' loans and to pay advance fees.

p.  It was further part of the scheme and artifice to
    defraud that Alan B. Morovitz and co-conspirators shared
    proceeds received from the scheme in the form of
    "advance fees", including the sending and receiving of
    proceeds valued at more than $5,000 from one co-

conspirator to another across state boundaries.

q.  It was pertinent to the scheme and artifice to defraud that no borrower and potential borrower referred to in this Information ever received a loan through Cergnul International, Inc., Group IV Capital Investments, Inc., Group IV Capital Funding Corporation, and Cergnul International, Inc.;

r . It was further part of the scheme and artifice to defraud that Alan B. Morovitz and co-conspirators through meetings, phone calls, and mailings, from time-to-time would assure the potential borrowers that loans would be forthcoming.

## MISREPRESENTATIONS

4.  It was a further part of the scheme and artifice to defraud that Alan B. Morovitz and co-conspirators, in order to induce borrowers and potential borrowers to pay advance fees, and to obtain money from said borrowers, and to lull the borrowers into a false sense of security as to the merits of the purported "loan commitment" and the loan itself, would and did, through advertisements, documents, conversations, and correspondence, omit material facts, and make false and misleading representations of material facts to the borrowers and potential borrowers, well-knowing that said representations would be and were false and misleading when made.

The false and misleading representations of material facts made to borrowers and potential borrowers by Alan B.

Morovitz and co-conspirators included, but were not limited
to, the following:

a.  That Alan B. Morovitz had extensive experience in
    real estate finance and possessed direct access to
    domestic and foreign funds for multi-million dollar
    loans;

b.  That Group IV Capital Investments, Inc. had successfully
    obtained funding for multi-million dollar loans on
    numerous occasions;

c.  That Cergnul International, Inc. had the financial
    capability and the intent of loaning potential borrowers
    millions of dollars;

d.  That Group IV Capital Investments, Inc. and Cergnul
    International, Inc. had together been successful in
    providing funds for multi-million dollar loans to
    previous clients;

e.  That loans had in fact been approved and funded in
    cooperation with Group IV Capital Investments,
    Inc. and Cergnul International, Inc.;

f.  That projects submitted by potential borrowers to
    Group IV Capital Investment, Inc. and Cergnul
    International, Inc. for loans were sound, feasible
    proposals for which funding would be made available;

g.  That multi-million dollar loans were then available
    to borrowers and potential borrowers during the time
    described in this Information;

h.  That once potential borrowers recieved the "loan

commitment" the loan would be closed and loan funds
would be made available;

i.  That the "loan commitment" instrument had been used by
the co-conspirators in the past to obtain loans for
other borrowers;

j.  That the potential borrowers would be protected by their
advance fees being placed and held in escrow;

k.  That the advance fees paid would belong to the potential
borrowers until earned by co-conspirators for services;

l.  That funds were committed and set aside for funding of
loans to individual borrowers;

m.  That the loans were meant to be closed.

## OMISSIONS

5.  It was a further part of the scheme and artifice to
defraud that Alan B. Morovitz and co-conspirators, in order
to induce borrowers and potential borrowers to pay advance
fees, and to obtain money from said borrowers would and did
conceal and omit to state material facts which were
necessary to prevent the statements from being misleading in
light of the circumstances under which they were made.
The material facts concealed and omitted by Alan B.
Morovitz and co-conspirators included, but were not limited
to, the following:

a.  That Alan B. Morovitz did not have the experience
in real estate finance claimed and had no direct
access to funds for multi-million dollar loans;

b.  That Giulio Negrini did not have the experience in real

estate, oil and gas, and mineral development financing claimed and had no direct access to funds for multi-million dollar loans;

c.  That Group IV Capital Investments, Inc. and Cergnul International, Inc. had never successfully worked together to close a loan;

d.  That the co-conspirators were acting in concert to defraud potential borrowers;

e.  That some projects submitted by potential borrowers for loans and upon which co-conspirators collected advance fees were not, in the minds of the co-conspirators themselves, sound or feasible financial proposals for which funds could or should be made available;

f.  That as to those projects which in the minds of co-conspirators themselves may be sound and feasible proposals, co-conspirators did not possess the means or intent of funding or of obtaining funding;

g.  That advance fees were shared by co-conspirators as soon as they were received from potential borrowers;

h.  That funding of loans was highly unlikely because of the inability of co-conspirators to close loans for other potential borrowers who had previously attempted to seek loans through the co-conspirators;

i.  That the "loan commitment" had not been successfully utilized by the co-conspirators to obtain loans in the past;

j.  That no funds were committed and set aside for funding of particular loans to individual borrowers;

k.  That the loans were never intended to be closed;

l.  That the co-conspirators designed and intended the "loan commitment" to be subject to interpretation and modification in ways that would provide co-conspirators a claimed justification for refusing to close loans.

## OVERT ACTS

6.  In furtherance of the conspiracy, and to effect the objects thereof, Alan B. Morovitz, Giulio Negrini, and other co-conspirators known and unknown to the United States Attorney, did  commit, among others, the following overt acts:

a.  On or about April 14, 1983, Alan B. Morovitz induced Ed Wylde and William J. McBurney to travel from Edmonds, Washington, to Boston, Massachusetts, in connection with $10,000 in advance fees paid by and on behalf of Altek Energy Corporation;

b.  On or about April 28, 1983, Alan B. Morovitz and Giulio Negrini induced James Fitzgerald and William J. McBurney to travel from Edmonds, Washington, to Philadelphia, Pennsylvania, in connection with an additional $8,000 in advance fees paid by and on behalf of Altek Energy Corporation;

c.  On or about May 2, 1983, Giulio Negrini mailed a letter to Altek Energy Corporation advising that Cergnul International, Inc. had approved a request for permanent

financing in the amount of $1.8 million;

d.  On or about August 5, 1983, Alan B. Morovitz mailed a
letter to James S. Fitzgerald, Esq., counsel for Altek
Energy Corporation, and to Giulio Negrini, refusing to
return unexpended fees to Altek Energy Corporation;

e.  On or about August 9, 1983, Giulio Negrini mailed a
letter to Altek Energy Corporation and to Alan B.
Morovitz declaring that Cergnul International, Inc.
would not finance the Altek Energy Corporation Project;

f.  On or about March 29, 1983, Alan B. Morovitz mailed to
David Weinstein a letter soliciting the business
involvment of Pema Energy Management Corp., inviting the
principals of Pema Energy Management Corp. to travel to
Boston, Massachusetts, and enclosing a promotional
brochure of Group IV Capital Investment, Inc.;

g.  On or about April 25, 1983, Alan B. Morovitz mailed to
David Weinstein a letter declaring that Julio (sic)
Negrini was the company lender for Group IV Capital
Investments, Inc. and soliciting $5,000 in advance fees
from Pema Energy Management Corp;

h.  On or about August 8, 1983, Giulio Negrini mailed to
Alan B. Morovitz a letter refusing to refund $5,000 to
Pema Energy Management Corp. and requesting Alan B.
Morovitz to so advise Pema Energy Management Corp.;

i.  In or about March, 1983, Alan B. Morovitz solicited
financial involvement of Beach Mining, Inc. by
representing to Allen B. Hughes that Giulio Negrini was

an associate and member of the Board of Group IV Capital
Investments, Inc. with capacity to lend $50 million to
Beach Mining, Inc.;

j.  On or about April 26, 1983, Alan B. Morovitz mailed to
Allen B. Hughes a letter confirming receipt of $10,000
in advance fees in connection with and in furtherance of
a commitment for a $50 million development loan for
Beach Mining, Inc.;

k.  On or about May 17, 1983, Giulio Negrini traveled from
the state of New York to Seattle, Washington, to meet
with Allen B. Hughes and to demand an additional fee of
$150,000 from Beach Mining, Inc.;

l.  On or about May 17-23, 1983, Alan B. Morovitz induced
Guy James to travel from Ft. Lauderdale, Florida, to
Boston, Massachusetts for the purpose of obtaining
$10,000 in advance fees in connection with Triangle
Enterprises;

m.  On or about June 3-4, 1983, Giulio Negrini traveled from
the state of New York to the state of Florida in
connection with an additional $18,500 paid to Cergnul
International, Inc. by and on behalf of Triangle
Enterprises;

n.  On or about May 19-24, 1983, Alan B. Morovitz and Giulio
Negrini induced Norwood S. Ashley and Paul R. Bjekich,
Esq. to travel from Yorkville, Illinois, to Boston,
Massachusetts, for the purpose of obtaining $15,000
in advance fees from K.G.M. Enterprises, Inc.;

14

o. On or about May 24, 1983, Alan B. Morovitz and Giulio
Negrini caused $15,000 to be wire transferred from the
Bank of Sugargrove at Sugargrove, Illinois, to BayBank
at Boston, Massachusets;

p. On or about June 24, 1983, Alan B. Morovitz and Giulio
Negrini took and received from Norwood S. Ashley and
Barbara Ashley an additional $45,000 in advance fees
paid by and on behalf of KGM Enterprises, Inc.;

q. On or about August 9, 1983, Giulio Negrini mailed to
Norwood S. Ashley a letter stating that Cergnul
International, Inc. would not fund the loan to K.G.M.
Enterprises, Inc.;

r. On or about June, 1983, Alan B. Morovitz contacted
Rowe Sanderson to solicit advance fees and made
false representations and promises that a lender in
Philadelphia had made a firm commitment to loan
$4,200,000 for Badger Mountain Orchards;

s. On or about June, 1983, Alan B. Morovitz and Giulio
Negrini induced Rowe Sanderson to travel from
Wenatchee, Washington, to Philadelphia, Pennsylvania, in
connection with the Badger Mountain Orchards Project;

t. On or about June 1, 1983, Alan B. Morovitz took and
received from Edward J. Wilkinson $10,000 in advance
fees for purported services in obtaining loan funds for
the Oakes Energy Associates Project;

u. On or about August 8-10, 1983, Alan B. Morovitz and
Giulio Negrini induced Edward J. Wilkinson to travel

from Bloomington, Minnesota, to New York, New York, in
connection with an additional $280,000 in advance fees
paid by and on behalf of Oakes Energy;

v.  On or about August 9-11, 1983, Giulio Negrini caused
$140,000 to be transported from the state of New York to
the state of Massachusetts and to be received and
possessed by Alan B. Morovitz;

w.  On or about August 29, 1983, Giulio Negrini mailed to
Edward J. Wilkinson and to Alan B. Morovitz a letter
falsely representing that Cergnul International, Inc.
and Group IV Capital Investments, Inc. were separate
entities and that contractual agreements of each were
not conjoined;

x.  On and about October 11, 1983, Giulio Negrini mailed to
Howard C. Goode, Esq., legal counsel for Oakes Energy,
and to Alan B. Morovitz demanding payment of an
additional $290,000 in advance fees to Group IV Capital
Investments, Inc. and further claiming that Giulio
Negrini was "ready, willing and able" at any time to
place $29 million in escrow as loan funds for Oakes
Energy;

y.  On or about December 5, 1983, Alan B. Morovitz mailed to
Howard C. Goode, Esq. a letter demanding an additional
$290,000 in advance fees from Oakes Energy;

z.  On or about December 21, 1983, Alan B. Morovitz and
Giulio Negrini caused Murray P. Reiser, counsel for
Group IV Capital Investments, Inc., to mail a letter to

Howard C. Goode, Esq. further demanding an additional
$290,000 in advance fees from Oakes Energy;

aa. On or about August 24, 1984, Giulio Negrini caused Frank
Carano, counsel for Cergnul International, Inc. to mail
to Howard C. Goode, Esq. and to Alan B. Morovitz a
letter stating that Cergnul International, Inc. declared
its commitment to loan funds to Oakes Energy was voided;

bb. On or about October 14, 1983, Alan B. Morovitz induced
Paul N. Fiorito and Richard F. Fincke to travel from
Bellevue, Washington, to Boston, Massachusetts, in
connection with $10,000 in advance fees paid by and on
behalf of American Grain Processing Corp.;

cc. On or about November 3, 1983, Alan B. Morovitz and
Giulio Negrini induced Paul N. Fiorito and Richard F.
Fincke to travel from Bellevue, Washington, to New York,
New York, in connection with an additional $30,000 in
advance fees paid by and on behalf of American Grain
Processing Corp.,

dd. On or about April 5-11, 1984, Alan B. Morovitz contacted
Charles D. Noble soliciting financial involvement of
Borrego Development Co., Inc., concerning the Overland
Junction Project;

ee. On or about April 11-12, 1984, Alan B. Morovitz and
Giulio Negrini induced Charles D. Noble to travel from
San Diego, California, to New York, New York;

ff. On or about May 2-4, 1984, Alan B. Morovitz and Giulio
Negrini took and received $60,000 in advance fees paid

17

by and on behalf of Borrego Development, Inc.;

gg.   In or about June, 1984, Alan B. Morovitz contacted Laura
      Packer, Esq., counsel for W. Wolf Properties, Inc.,
      soliciting the business involvement of W. Wolf
      Properties, Inc. concerning Lake Miramar Ranch
      Development;

hh.   On or about June 24-25, 1984, Alan B. Morovitz and
      Giulio Negrini induced Walter Wolf, Laura Packer, Esq.
      and James Bevan to travel from San Diego, California, to
      New York, New York, in connection with $100,000 in
      advance fees paid by and on behalf of W. Wolf
      Properties, Inc.;

ii.   On or about July 23, 1984, Giulio Negrini mailed to Alan
      B. Morovitz a letter advising that Cergnul
      International, Inc. and one of Giulio Negrini's "major
      banks" was considering financing $75 million to W. Wolf
      Properties, Inc., and further advising that Cergnul
      International, Inc. would protect the interest of Group
      IV Capital Investments, Inc.;

jj.   On or about July 26, 1984, Alan R. Morovitz and Giulio
      Negrini took and received an additional $100,000 in
      advance fees paid by and on behalf of W. Wolf
      Properties, Inc.;

kk.   On or about January 5, 1984, Alan B. Morovitz mailed a
      letter to William H. Harrington soliciting the business
      involvement of Rim Rock Production Corp.;

ll.   On or about August 27, 1984, Alan B. Morovitz and Giulio

Negrini caused Rim Rock Production Corp. to wire transfer $75,000 from Parkersburg National Bank at Parkersburg, West Virginia, to Chase Manhattan Bank at New York, New York;

mm. On or about September 24, 1984, Alan B. Morovitz and Giulio Negrini caused Rim Rock Production Corp. to wire transfer an additional $75,000 from Union Central National Bank at Vienna, West Virginia, to Chase Manhattan Bank at New York, New York;

nn. In or about March, 1984, Alan B. Morovitz induced Arthur K. Martinson to travel from Madison, Wisconsin, to Boston, Massachusetts, concerning Artex National Corporation;

oo. On or about August 21, 1984, Giulio Negrini mailed to Arthur K. Martinson and to Alan B. Morovitz a letter claiming that Cergnul International, Inc. was "ready, willing and able" to provide $50 million as loan funds for Artex National Corporation;

pp. On or about September 26, 1984, Alan B. Morovitz and Giulio Negrini induced Arthur K. Martinson to travel from Madison, Wisconson to New York, New York, and took and received $150,000 in advance fees paid by and on behalf of Artex National Corporation;

qq. On or about February 8, 1985, Alan B. Morovitz contacted Lorne E. Tjernagel to solicit the business involvement of Grasen Energy, Inc.;

rr. On or about March 19-20, 1985, Alan B. Morovitz and

19

Giulio Negrini induced Lorne E. Tjernagel, Jerold L. Shursen and Donald M. Dean, Esq. to travel from Amarillo, Texas, to New York, New York, in connection with Grasen Energy Corp;

ss. On or about November 6, 1984, Giulio Negrini mailed a letter to the Wall Street Journal at New York, New York, representing that all business relations between Cergnul International Inc. and Group IV Capital Investments, Inc. had been "very satisfactory" and that Alan B. Morovitz and Group IV Capital Investments, Inc. were "responsible and capable for their business commitments."

All in violation of Title 18, United States Code, Section 371.

FRANK L. McNAMARA, JR.
United States Attorney

By: _____
VICTOR A. WILD
Assistant U.S. Attorney